U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUN 17 2005

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## ALEXANDRIA DIVISION

| | |
|---|---|
| JOANN WAGGONER | |
| -vs- | CIVIL ACTION NO. 01-CV-2472-A |
| UNITED STATES OF AMERICA | JUDGE LITTLE |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above captioned matter was tried before the court on the 13th and 14th of April, 2005. After a careful and thorough review of the voluminous record, which contains several hundred pages of medical records as well as numerous other filings, the court makes the following statement of its findings of fact and conclusions of law as required by FED. R. CIV. P. 52(a).

### Findings of Fact

1. This medical malpractice action has been brought by JoAnn Waggoner ("Mrs. Waggoner") on her own behalf and on behalf of her now deceased spouse, Wilmer Waggoner ("Mr. Waggoner"), pursuant to the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 1346(b).

2. Mrs. Waggoner alleges that the staff of the Alexandria Veterans Affairs Medical

Center ("Alexandria VA") was negligent in its treatment of Mr. Waggoner, and that this negligent treatment caused injury to Mr. Waggoner and his death.

3. Prior to seeking treatment at the Alexandria VA, Mr. Waggoner was admitted to the Rapides Regional Medical Center ("Rapides Medical") in Alexandria because he complained of chest pain.

4. Physicians at Rapides Medical performed a cardiac catheterization on Mr. Waggoner and determined that he had coronary artery disease with minor plaquing and without severe obstructive lesions.

5. The record shows that, in addition to his coronary artery disease, Mr. Waggoner was a smoker, had a history of hypertension, suffered from degenerative back ailments and a fractured seventh rib with a corresponding damaged nerve, and had elevated cholesterol and triglyceride levels.

6. Mr. Waggoner began seeking treatment at the Alexandria VA in 1992.

7. In September of 1992 Mr. Waggoner was examined by Dr. Jackson Galloway at the Alexandria VA. At this time, he complained of pain in the "lower back chest area with strenuous work." Dr. Galloway diagnosed Mr. Waggoner with bilateral carotid bruits secondary to arteriosclerosis and recommended that he return for further testing. It was unclear, however, if the pain Mr. Waggoner experienced was related to a coronary problem, to a fractured seventh rib and damaged nerve from which he suffered, or from the problem with his carotid arteries.

8. In February of 1993, Mr. Waggoner was given a thallium stress test that indicated

that his chest discomfort was not cardiac in origin.

9. Mr. Waggoner returned to the Alexandria VA complaining of "chest discomfort" in August of 1993 and was seen by Dr. Narayana Swamy, a cardiologist. Dr. Swamy ran various tests on Mr. Waggoner and recommended that he return to the cardiology clinic in two months.

10. Due to cancellations by both the Alexandria VA and Mr. Waggoner, however, Mr. Waggoner was not examined by Dr. Swamy again until 29 March 1994.

11. At the 29 March 1994 appointment, Mr. Waggoner indicated that he had not had any chest pain since February and that his prior chest pain was alleviated by taking nitroglycerin.

12. In November of 1994, Mr. Waggoner was admitted to the Alexandria VA with a "transient ischemic attack," which is a short-lived stroke. A carotid arteriogram was done, and it showed that Mr. Waggoner suffered an almost complete blockage of his left internal carotid and a 75% blockage of his right internal carotid.

13. Mr. Waggoner underwent a left carotid endarterectomy on 16 November 1994 and a right carotid endarterectomy on 5 January 1995.

14. Mr. Waggoner next arrived at the Alexandria VA on 30 January 1996. He complained of intermittent chest pain that was sometimes relieved by taking nitroglycerin. A stress test was administered, and it indicated that Mr. Waggoner suffered from a left bundle branch block ("LBBB").

15. Testimony at trial established that the presence of a LBBB makes it difficult to

determine from the results of a regular cardiac stress test if a patient suffers from ischemia.

16. On 11 April 1996, Mr. Waggoner returned to the Alexandria VA for a flu appointment and medication refill and was seen by Dr. Kamalendra Mondal. The progress notes indicate that he complained of angina that was relieved by one tablet of nitroglycerin and that he was scheduled for a stress test on 24 April 1996.

17. During an 11 April 1996 visit, Dr. Swamy cancelled the appointment for a regular stress test due to the presence of the LBBB and ordered instead a thallium stress test.

18. A thallium stress test was scheduled for 25 July 1996, but Mr. Waggoner cancelled the appointment. There is no indication in the record as to why he did so.

19. Mr. Waggoner returned to the Alexandria VA on 16 August 1996 stating: "my back hurts." Mr. Waggoner informed Dr. Mondal that he was still experiencing angina that was relieved by nitroglycerin. Dr. Mondal suggested that Mr. Waggoner be admitted to the hospital for further tests, but Mr. Waggoner refused. He said that he would return for admission on 21 August 1996.

20. Mr. Waggoner did not arrive at the Alexandria VA on 21 August 1996, but instead arrived on 26 August 1996 and was admitted. He told doctors that his chest pain had been getting worse over the last year, and that for the last two weeks he had been having chest pain everyday. Dr. Mondal prescribed a number of tests meant to determine if the chest pain was cardiac in origin, including a thallium stress test.

21. The thallium stress test that was ordered was not performed. The reason for this is not explained in the record. Dr. Mondal testified that he does not remember if the thallium test was not performed because of the unavailability of a requisite machine or if a cardiologist or radiologist was unavailable. A regular stress test was performed instead on 29 August 1996. That test lasted for three minutes and two seconds and was terminated because of leg fatigue, therefore, it was deemed inadequate by Dr. Mondal.

22. Dr. Mondal also ordered 24 hour telemetry during Mr. Waggoner's hospitalization, but Mr. Waggoner frequently went off the telemetry machines so that he could go outside to smoke.

23. On 30 September 1996, Mr. Waggoner returned to the Alexandria VA. He claimed that his chest pain had been less frequent and was told by Dr. Mondal to schedule a thallium stress test. None was scheduled, and the record gives no indication as to whether this was due to the fault of the Alexandria VA or Mr. Waggoner.

24. Mr. Waggoner was next seen at the Alexandria VA on 2 December 1996. A stress test was scheduled for 19 February 1997, but it was cancelled because it was a regular stress test. A thallium stress test was scheduled for 5 March 1997, but Mr. Waggoner did not show up for this appointment or a subsequent appointment scheduled for 4 April 1997.

25. Mr. Waggoner next returned to the Alexandria VA on 5 May 1997. During that visit

a thallium stress test was scheduled for 20 May 1997.

26. On 27 May 1997, Mr. Waggoner returned to the Alexandria VA to obtain the results of his thallium stress test. The test indicated that his coronary artery disease had worsened, that he suffered from ischemia and that he had an area of permanent defect on the wall of his heart.

27. After receiving the results of the thallium stress test, Dr. Mondal ordered a MUGA scan and other tests that he testified were intended to verify the results of the thallium stress test. These tests were scheduled for 3 June 1997, but Mr. Waggoner did not show up for this appointment. The MUGA scan was then rescheduled for 17 June 1997, but Mr. Waggoner canceled that appointment. The tests were not rescheduled.

28. On 3 September 1997, Mr. Waggoner returned to the Alexandria VA and indicated that he continued to have chest pain. Dr. Mondal testified that he told Mr. Waggoner he could admit him for more tests but that Mr. Waggoner declined. He was referred instead for a cardiology consult.

29. Mr. Waggoner returned to the Alexandria VA on 22 October 1997 for a urology appointment. He did not at that time indicate that he was continuing to have chest pain.

30. On 14 November 1997, Mr. Waggoner arrived at the Alexandria VA. He complained of chest pain that radiated across his chest and was relieved by nitroglycerin. The progress notes from that visit indicate that Mr. Waggoner had not yet seen a

cardiologist. The doctor who saw Mr. Waggoner requested that he be seen by a cardiologist within the next "week or so," and he instructed Mr. Waggoner to call if he was not given a cardiology appointment within the next two weeks.

31. A cardiology appointment was scheduled for Mr. Wagner on 16 December 1997.

32. Mr. Waggoner suffered a heart attack prior to the date of his next appointment at the Alexandria VA. Mrs. Waggoner testified that after being sick for approximately one week, early on the morning of 13 December 1997, Mr. Waggoner told her that his "chest was killing him." Mrs. Waggoner asked him if he wanted to go the hospital, but he said he was not going and that he was going to go back to bed. About 6:30 that afternoon, Mr. Waggoner "staggered into the living room." He was fumbling with a bottle of nitroglycerin, and after putting one tablet under his tongue, he told Mrs. Waggoner that he needed to go outside to get some air. While trying to walk outside, Mr. Waggoner collapsed. His wife managed to get him into the car, and she drove him to him to the emergency room at Oakdale Community Hospital. He was later transferred to Dubois Hospital of Alexandria.

33. Mr. Waggoner passed away on 4 January 1998. The death certificate lists his causes of death as respiratory failure, congestive heart failure, myocardial infarction, and coronary heart disease.

34. Throughout the time that Mr. Waggoner was being treated at the Alexandria VA his lipid levels were tested. These tests showed that Mr. Waggoner's cholesterol

readings fluctuated from as low as 197 to as high as 295. His cholesterol levels were frequently within a range between 200 and 240, which the trial testimony indicates is of moderate concern. Various lab results also show that he had triglyceride levels between 300 and 500 at various times. Mr. Waggoner was not medicated for his hyperlipidemia, but he was instructed to change his diet and to stop smoking. Nothing in the record indicates that he complied with either of these instructions.

## Conclusions of Law

35. "Under the Federal Tort Claims Act, the controlling substantive law is provided by the state where the negligent act occurred, which in this case is Louisiana." Dimitry v. U.S., 893 F.2d 666, 668 (5th Cir. 1989).

36. To establish a cause of action for medical malpractice under Louisiana Law, the plaintiff must show that there is a relevant standard of care, that the defendant breeched that standard of care, and that the plaintiff suffered injuries that would not have otherwise occurred as a proximate result of that breach of the standard of care. See LA. REV. STAT. ANN. 9:2794(A) (West 2005); Hemingway v. Ochsner Clinic, 722 F.2d 1220, 1224-25 (5th Cir. 1984).

37. "In medical malpractice actions . . . the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician . . . . [I]njury alone

does not raise a presumption of . . . negligence." LA. REV. STAT. ANN. 9:2794(C).

38. The standard of care to which a physician is held is that he must possess the degree of knowledge or skill and exercise the degree of care normally possessed or exercised by physicians practicing in a similar location and under similar circumstances. LA. REV. STAT. ANN. 9:2794(A)(1). Plaintiff offers four arguments as to how the physicians of the Alexandria VA breached such a standard of care.

39. First, Plaintiff argues that "[u]pon assuming cardiology care for the decedent, the VA should have immediately requested medical records from Rapides Regional Medical Center . . ." No evidence, however, was introduced as to any normative practice regarding the collection of medical records detailing previous procedures. In other words, Plaintiff has failed to establish that an applicable standard of care exists that required Alexandria VA physicians to obtain Mr. Waggoner's medical records from Rapides Medical.

40. Second, Plaintiff contends that Alexandria VA physicians breached the standard of care when they failed to prescribe to Mr. Waggoner medication intended to lower his hyperlipidemia. Mr. Waggoner's cholesterol readings were frequently in the borderline range between 200 and 240 and were occasionally high. His triglyceride levels were also high. The Alexandria VA physicians, however, did not prescribe to Mr. Waggoner medication for lowering his cholesterol or triglycerides. Instead, they instructed Mr. Waggoner to change his diet. There is no evidence that Mr. Waggoner

complied with these instructions. Plaintiff's expert witnesses, Dr. Louis Leatherman and Dr. David Elizardi, both testified that Mr. Waggoner should have been treated for his hyperlipidemia, but neither man claimed that medication is the only means for treating that condition. Diet, exercise, and cessation of smoking are all alternative means for lowering lipid levels that were suggested by Alexandria VA physicians. Those physicians instructed Mr. Waggoner to follow a course of action that it is reasonable to assume would have addressed the problem without the need for medication that can have deleterious side-effects. The court finds, therefore, that Plaintiff has failed to establish that the applicable standard of care required Alexandria VA physicians to medicate Mr. Waggoner for his hyperlipidemia.

41. Third, Plaintiff asserts that Alexandria VA physicians breached the standard of care because the thallium stress test ordered on 24 April 1996 by Dr. Swamy was not performed until May of 1997. The thallium stress test ordered by Dr. Swamy was scheduled for 25 July 1996, but Mr. Waggoner did not arrive for that appointment. Later, when Mr. Waggoner was hospitalized for tests during the last week of August, he was given a regular stress test instead of a thallium stress test. Dr. Mondal's testimony, however, indicates that a thallium stress test was not available at that time, although he cannot say why that was the case. This is, however, corroborated by the medical records that indicate that a thallium stress test was ordered on 26 August 1996, but that order was later changed to one for a regular stress test. Following Mr.

Waggoner's hospitalization, the medical records contain progress notes, dated 30 September 1996 and 2 December 1996, stating that Mr. Waggoner had been told to schedule a thallium stress test. A regular stress test was scheduled for 19 February 1997, but Dr. Swamy ordered that a thallium stress test be scheduled instead. The patient then missed two appointments for thallium stress tests before finally arriving for one on 20 May 1997. Much of the delay in obtaining a thallium stress test was caused by Mr. Waggoner's not showing up for scheduled appointments. Other delays were caused when a test was not scheduled even though the progress notes indicate that Mr. Waggoner was informed that he needed to schedule one. Nothing in the record indicates whether this failure to schedule an appointment was caused by the actions of the Alexandria VA or by Mr. Waggoner himself. Accordingly, the court finds that Plaintiff has failed to establish that the failure of the Alexandria VA to give Mr. Waggoner a thallium stress test during his hospitalization was due to negligence on the part of the Alexandria VA physicians. Mr. Waggoner arrived at the Alexandria VA for his hospital stay without notice. Given this, it is just as likely that necessary equipment or personnel were not available at that time. Accordingly, the court finds that Plaintiff has not shown that the Alexandria VA breached a pertinent standard of care because it has not shown that the delays experienced in obtaining a thallium stress test were due to negligence on the behalf of the Alexandria VA staff.

42. Finally, Plaintiff avers that it was a breach of the standard of care for Mr. Waggoner

not to be given a cardiac catheterization following the results of his 20 May 1997 thallium stress test. That test indicated that Mr. Waggoner's coronary artery disease had worsened and that he suffered from ischemia and a permanent defect in the wall of his heart. After receiving the results of this thallium stress, test Mr. Waggoner was scheduled for a MUGA scan and other tests that Dr. Mondal testified were meant to verify the results of his thallium stress test. Mr. Waggoner did not show up for this appointment, nor did he show up for a subsequently scheduled MUGA scan. Once he reappeared at the Alexandria VA, he was referred to a cardiologist. Although Plaintiff's expert witnesses testified that they believed the MUGA scan to be superfluous and unnecessary, ordering it was not a breach of the standard of care. On the contrary, the scheduling of the MUGA scan indicates that the Alexandria VA physicians were following up on the results of Mr. Waggoner's thallium stress test. What actions Dr. Mondal and others would have taken after attempting to verify the results of that test cannot be known. It is clear to the court, however, that it was the actions of Mr. Waggoner that resulted in interrupting his treatment by the Alexandria VA. After being informed that his coronary condition had worsened severely, he failed to attend two appointments and neglected to reschedule the tests ordered by his doctors. The court finds, therefore, that Plaintiff has failed to establish that Mr. Waggoner's not receiving a cardiac catheterization or treatment for his coronary artery disease subsequent to his receiving the results of his thallium stress test was

due to negligence on the part of Alexandria VA physicians.

## Conclusion

Based on the above stated findings of fact and conclusions of law, the court finds that Plaintiff has failed to establish that she is entitled to relief because she has not shown that the staff of the Alexandria VA breached a relevant standard of care in its treatment of Mr. Waggoner. Accordingly, judgment will be entered in favor of the Defendant, the United States of America.

Alexandria, Louisiana

17 June 2005

F. A. LITTLE, JR.
UNITED STATES DISTRICT JUDGE

13